# WL| Wright Law
## ATTORNEY AT LAW

---

**299 BROADWAY, SUITE 708**
**NEW YORK, NY 10007**
**OFFICE (212) 822-1419 • FACSIMILE (212) 822-1463**
wrightlawnyc@gmail.com

November 23, 2025

**VIA ECF**
The Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   **Re:** *United States* **v.** *Miguel Bisono 23-cr-00405-LTS*

Dear Judge Swain:

  The undersigned respectfully submits this letter in advance of Miguel Bisono's ("Miguel" or "Mr. Bisono") sentencing proceeding, which is scheduled for December 3, 2025, following his June 6, 2025 guilty plea, to the lesser included under count one of the instant Indictment to conspiracy to distribute and possess with intent to distribute 500 grams or more of substances containing a detectable of cocaine in violation of 18 U.S.C. § 841(B)(1)(b).

  **I.** **Preliminary Statement**

  There is no excuse for my actions. I know that no apology can undo the damage I've caused or make right the wrongs I've committed. But I want you to know, with all my heart, how truly sorry I am. My decisions are now a ton of weight sitting on my chest, and the consequences playing over and over in my head. I have hurt people I love and respect, and the guilt I feel is overwhelming.

  -Miguel Bisono

  Miguel is a 46 year old man who is a deeply beloved father, son, sibling and a dear friend to many. Miguel regretfully yielded to the temptation of making "easy money" and shamefully played an integral role in a narcotics conspiracy that placed people at great risk. In doing so, he devastated his loved ones - most especially his young children, betrayed himself and committed a serious crime.

  It is a universally acknowledged truth that accepting one's transgression is the first step towards redemption. That is precisely what Miguel did by accepting full responsibility for his offense conduct and sincerely grappling with the poor decisions he has made throughout

1

adulthood. With the wisdom of being a middle-aged man coupled with the last two years incarcerated and now facing the frightening abyss of a significant jail sentence; Miguel truly understands the profound harm his actions have caused society. Miguel wakes up every morning in his desolate jail cell with the crushing awareness of the gravity and consequence of his criminal conduct; conduct for which he readily accepted responsibility, pled guilty and stands ready to be sentenced.

We respectfully request the Court sentence Miguel to the mandatory minimum sentence of five years[1]; needless to say we are cognizant that this request is a significant variance from the guideline range and the sentence recommendation by the U.S. Department of Probation ("Probation"). The sentence requested by the defense would properly account for Miguel's role in this offence, his acceptance of responsibility, his need for medical treatment, his abundant family support and his compelling personal history.

## II.    Legal Standard

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the U.S.S.G guideline range, as well as any basis to depart from that range. However, the court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

The guidelines are only the "starting point and initial benchmark…" Id., citing *Gall v. United States,* 552 U.S. 38, 50 (2007). "Sentencing courts are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an individualized assessment based on the facts presented.'" *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (internal citations omitted). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 552 U.S. at 109, *citing Gall*, 552 U.S. at 51.

In determining a sentence for Miguel that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of Miguel. A consideration of those characteristics, along with the remaining six factors,[2] may render sentences that do not fit

---

[1] The statutory mandatory minimum prison sentence under a conviction for violating 18 U.S.C. § 841(B)(1)(b) is five years. *See also* PSR at ¶124.

[2] The seven factors are (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to reflect the goals of sentencing set forth in § 3553(a)(2); (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims. See 18 U.S.C. § 3553(a).

within the guidelines, yet are fair and meet the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

More explicitly those sentencing goals include:

[T]he need for the sentence imposed:
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
See, 18 U.S.C. § 3553(a)(2)

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 50. Rather, the Court must make an individualized assessment based on the facts presented. From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 552 U.S. at 101, *citing* 18 U.S.C. § 3553(a). The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense." 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, at 54; *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

There is no dispute between the Pre-Sentence Report ("PSR") and the plea agreement concerning the applicable guidelines range; both calculate Miguel's guidelines range to be 210 months to 262 months. PSR ¶125. Probation recommends a downward variance sentence of 180 months of imprisonment to be followed by four (4) years of supervised release. PSR at pg. 30. We respectfully request a sentence significantly below that recommended by Probation, a sentence that would properly account for all of the § 3553(a) factors.

### III.      18 U.S.C. § 3553(a) Factors

#### *(1) Nature and Circumstances of the Offense – Acceptance of Reasonability*

As detailed in the PSR between September 2022 and May 2023, Miguel was an essential figure in a narcotics conspiracy that trafficked drugs throughout the New York City area. PSR ¶¶ 6-9. More specifically, Miguel communicated with his co-defendants (Dajhaan Perez and Peter Hardie) over encrypted messaging platforms about the distribution and sale of narcotics. PSR ¶¶51-60. Miguel acted in a supervisory capacity wherein he received drug profits and directed

other individuals to engage in drug sales, he unquestionably accepted that responsibility in his plea allocution and does not contest his two-level upward role adjustment. PSR ¶¶7, 71; *see* U.S.S.G. §3B1.1(c).

On May 23, 2023, law enforcement officers executed a search warrant at a "Stash House" at an apartment building in North Bergen, New Jersey where narcotics were recovered and a firearm was found inside a safe in that apartment. PSR ¶¶34-37; *see also* ECF No. 143, Govt. Sent. Memo to Hardie at pg. 2.  Co-defendants Perez and Hardie were present at the Stash House and promptly arrested. Id.  Miguel was not there and was not arrested until January 25, 2024 in the state of Ohio.  PSR ¶61.  Although Miguel stipulated to the firearm enhancement in regard to his offense level calculation (PSR ¶69), significantly there is no evidence that Miguel ever actually possessed that firearm nor is there any evidence that Miguel ever possessed any firearm in furtherance of a drug transaction.  Indeed, the government describes the New Jersey apartment ("Stash House") where the firearm was recovered as "controlled by Hardie." *See* Govt. Sent. Memo to Hardie at pg. 2, 18.   There is no evidence that Miguel *shared* that control with Hardie or spent significant time at the stash house.

Similarly, although Miguel stipulated to fentanyl in the plea agreement and it plays a significant role in driving up his guideline range. PSR ¶68.  The fentanyl recovered in this case was found in the same Stash House where the firearm was recovered, and again Miguel was not present at that time nor did he maintain any control over the stash house. Miguel did not affirmatively plead guilty to the distribution of fentanyl, rather he only pled guilty to pursuant to the plea agreement to the distribution of cocaine.  The defense is not aware of any evidence that Miguel, himself, sold or distributed fentanyl.

In that co-defendant Hardie controlled the Stash House and was present when the firearm and fentanyl were recovered, again *sans* Miguel's actual presence, very arguably that places Miguel in a less culpable position within the larger conspiracy than Hardie.  That said, Miguel is nevertheless acutely aware that his criminal conduct placed people at great risk and he readily admits that narcotics sales are "*not* victim-less crimes."

Put simply, Miguel concedes that although he did not control the Stash House, that fact alone does not minimize his conduct or the risks attendant to any sale of narcotics and he regretfully yielded to the temptation of making easy money.  He categorically accepts the integral supervisory role he played in this narcotics conspiracy and more meaningfully he accepts his shameful role in our nation's existential struggle with drug abuse.

### (2) *History and Characteristics*[3]

#### a.    Miguel Bisono's Upbringing

Miguel was born in Santo Domingo, Dominican Republic in 1979 and raised by a hardworking and loving mother, Yanina Mateo, who labored to instill good values and a strident work-ethic in her young son despite their financial deprivations in their native country.  Miguel

---

[3] The biographical information contained herein is derived from the PSR ¶¶87-118, interviews of the defendant and his family members.

came to the United States when he was 12 years old in January of 1992 to join his mother as they longed for a better and more prosperous life here in the United States. Upon his arrival in the US, Miguel lived with his mom in the Long Island town of Brentwood, NY where he attended local public schools and settled into a working class suburban American town. In 1995, Miguel very proudly became naturalized as a United States citizen.

Miguel's father largely abandoned him in his childhood and he grew up with no father-figure to help guide him. To the extent his father was around he was frequently abusive towards him and his mother – having borne witness to his father's severe physical assaults on his mother. Moreover, Miguel's mother was unable to protect him from the vicissitudes of his father's anger as she herself was often the target. Miguel was also let down by Dominican social service agencies as they never intervened to protect him or his mother; to the extent he recalls any child protective agency they were either utterly ineffectual or apathetic.

Even more acutely disquieting for young Miguel was an incident of where he was the victim of a sexual assault when he was five years old by a group of older men while he was still living in the Dominican Republic. At the time, Miguel felt like he had no adult to turn to for help. Miguel holds particular anger towards his father as his absence contributed to Miguel's vulnerability thereby making him an easier target for sexual predators. That sexual assault haunts Miguel to this day as he continues to harbor a deep and abiding shame.

The irony is not lost on Miguel that the suffering he has endured from having an absent father, his own children now find themselves going down the same path with an absent father – albeit due to his regretful decision to engage in the instant offense conduct

    b.    **<u>Miguel Bisono's Adulthood</u>**

*Employment and Prior Drug Conviction*

Miguel has resided in Long Island for most of his adulthood and over the last decade Miguel has been employed fairly consistently in various jobs working at warehouses in Nassau and Suffolk counties. Admittedly the employment was not exactly "glamorous" but it provided him with very modest income and a measure of stability. In addition, he became something of a renowned barber among his friends, so cutting hair helped supplement is humble salary.

Tragically, Miguel found himself involved with narcotics which ultimately led to his arrest in August 2015 and ultimately led to his one and only prior criminal conviction. As detailed in the PSR Miguel was arrested for possessing heroin in Manhattan and ultimately sentenced to three (3) years in state prison. PSR ¶81. Miguel was released from New York state prison in early 2017 and appeared to be doing quite well after his release. As verified by Probation, Miguel completed an out-patient drug treatment program and was gainfully employed while on parole. Id. Indeed, Miguel was so successful while on parole the New York State Division of Parole awarded him a "merit termination" in November 2019 thereby ending his parole 2 years early. Id.

5

By all appearances as a new decade started in 2020, Miguel appeared to be on an expectant road after his successful early completion of parole. Attached to this sentencing memo is 13 compelling letters from Miguel's loving family and friends; evidently Miguel is a deeply adored father and brother and highly regarded by his friends and family members. *See* Ex. A.[4] Needless to say, the instant offense conduct and conviction is a catastrophic and ruinous stain on Miguel's life.

### *Miguel's Family*

Miguel is now 45 years old and the very proud father of five biological children and a step-son.  His eldest son, Jonathan Bisono, is 28 years old and lives in Ohio with his wife along with Miguel's second oldest son, Matthew Bisono who is 26..  Miguel also has three minor children who all live here in New York: BB, age 17; KB, age 9 and MB, age 8.  Miguel's two youngest children live with his most recent partner, a woman he was together with for over a decade but since his current period of incarceration they are just co-parenting and she remains steadfast in his corner.  Needless to say Miguel's current ability to parent is severely limited but he remains in close contact with all of his children through phone calls and letters.

Miguel's oldest sons Jonathan and Matthew have both achieved outstanding academic success, each one obtaining a master's degree and both have found consistent and steady employment.  Jonathan exalts his father's many virtues and the incomparable role he has played in his life:

> Growing up, my father was never easy on me, but for all the right reasons. He was determined to make me a better man than he could ever be. He pushed my brothers and me to complete our master's degrees while being collegiate athletes. He didn't stop at just that; he set standards and goals in everything we pursued: grades, accolades, and relationships. From as early as I can remember, my dad always preached the values of respect, loyalty, and love.
> Ex. A1

Matthew strikes a similarly redemptive cord crediting his father for his accomplishments writing "My father's constant support throughout my undergraduate and masters program helped me strive and obtain a bachelors and master's degree just by simply offering emotional support when I needed it most." Ex. A3.  The admirable achievements of Jonathan and Matthew brings immeasurable pride and joy to Miguel – his kindness and love for them both is evident in their success.  Miguel's adult sons are deeply disappointed in his offense conduct but are ever sanguine that their father will be a better man, Jonathan in particular writes "[Miguel] accepts full accountability and speaks with a deeper sense of humility and regret for his actions." Ex. A2.

Miguel's step-daughter, Brianna, further documents his warmth and care as a parent "[h]e is selfless and a devoted father who carries himself with integrity" and that he "welcomed me as his daughter in law with open arms". Ex. A5. His step-son, Jose Contreras,  is absolute and unfaltering in his support "[Miguel] has always been and will always be a father to me" and treated Jose as if he were his own biological son "[Miguel]

---

[4] A collection of letters from Miguel's family and friends is attached as Exhibit A.

became a father figure in my life. The bond I share with him and my stepbrothers is unbreakable." Ex. A14.  Its inspiring that Jose much like his two step-brothers has also achieved academic success similarly obtaining a post-graduate degree and professional accomplishments. Id.

It can't simply be a coincidence that Miguel's three oldest children (Jonathan, Matthew and Jose) have achieved such remarkable academic and personal achievement in adulthood.  Miguel was crucial to their success, but unfortunately similar fortune has remained sadly elusive in his own life.

The assembled letters extol Miguels's resolute commitment to helping his family members and his inherent humanity.  They also speak to his self-evident love for his children and the decidedly incongruous offense conduct frustrates a satisfactory explanation to all who know and love Miguel.

Ultimately, the abundant love demonstrated by Miguel's kind and generous family turned out to be bittersweet, albeit due to his regretful decision to engage in the instant offense conduct.  Paradoxically, the very people who love Miguel the most, his children and family, have suffered the most as a result of his criminal conduct.  In particular, he has placed his youngest children in the terribly precarious position of losing their father to many years in prison.

Miguel deeply feels the betrayal, disgrace, and humiliation his behavior has caused his family as well as the incalculable harm narcotics causes to society.  Despite his current predicament, Miguel counts himself very lucky that he has so many good people who love him and want to help him as he struggles through life and moves on from the instant criminal case.

### *(3) Significantly Below Guidelines Sentence is Sufficient, But Not Greater than Necessary, to Satisfy the Purposes of Sentencing*

#### a. <u>"Just" Punishment</u>

Miguel has continued to show remorse and reflect on how his criminal conduct affected society and his family; a sentence at the bottom of the statutory minimum and a period of years of supervision will undoubtedly serve as a significant deterrent against any future recidivism.  Miguel readily concedes that his prior time in a New York state prison did not have the desired deterrent effect but he has confided that the last two years in jail have been deeply impactful upon him and he is unyielding in his desire to turn his life around.  Demonstrative of this commitment to change has been his stellar behavior record at the Hudson County Correctional Center where he has been held since February 2024 incurring no disciplinary infractions.  PSR ¶5.

While nothing can overstate the seriousness of the offense conduct in this case — Miguel conspired with others to distribute large amounts of narcotics — the lengthy sentence provided by the Guidelines does not properly calibrate "just punishment" that is "sufficient but not greater than necessary" to meet the sentencing statute's goals.  While lawmakers are understandably

anxious to address our nation's drug crisis, there is simply no empirical evidence that tougher prison sentences in line with the Guidelines are an effective means of deterrence in drug cases. See *United States v. Diaz*, No. 11-CR-00821 (JG), 2013 WL 322243, at * 1 (E.D.N.Y. Jan. 2013) ("the Guidelines ranges for drug trafficking offense are not based on empirical data, Commission expertise, or the actual culpability of defendants. If they were, they would be much less severe, and judges would respect them more.").

As detailed above Miguel's neglected childhood and deeply troubled family life is an obvious factor that should be considered in determining an appropriate sentence. Courts will often consider how adverse socio-economic conditions affect defendants and their relationship to the criminal justice system. See *U.S. v. Bannister*, 786 F. Supp. 617 (E.D.N.Y. 2011). The late great Hon. Jack B. Weinstein eloquently writes in his *Bannister* decision:

> Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass. Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, to obtain crucial opportunities for education, work, and personal growth, and to act as useful role models. Those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense. That the defendants were born into circumstances without such support is at the center of this tragedy.

*Id.* at 688-689.

By any measure, Miguel grew up in a chaotic and neglected environment dominated by absent parents, domestic violence and sexual abuse. Those difficulties most assuredly contributed to his adulthood irresponsibility and his habitual substance abuse; all of those factors inform a whole host of poor decisions made by Miguel throughout his adulthood.

### b.    Criminal History Category is Overstated

Miguel does not dispute his Criminal History Category of III; but we contend that this classification overstates his *true* criminal history. PSR ¶82. His criminal history computation is based on 3 points from his three year jail sentence from a 2016 New York State conviction (PSR ¶81) and 1 point from a 2014 driving while ability impaired by alcohol (DWAI) conviction (a traffic infraction[5]) where he received a fine (PSR ¶80); as a consequence these 4 points land him in Criminal History Category of III thereby significantly driving up his guidelines range. PSR ¶¶82, 125.

Miguel's DWAI conviction places him in a more severe criminal history than his co-defendants, despite their demonstrably worse criminal histories, demonstrating the imbalanced approach to guideline calculations. Co-defendant Perez was in Criminal History Category II

---

[5] *See* N.Y. State V.T.L. §§1192.1 and 1193(1)(a) (" Driving while ability impaired… shall be a traffic infraction").

despite having a prior federal drug conviction where he received a 43 month jail sentence and committing the instant offenses while on supervised release. *See* ECF No. 74, Govt. Sent. Memo to Perez at pg. 14, 16-17.  Even more striking is the comparison to co-defendant Hardie who was also in Criminal History Category II despite *not* only committing the instant offenses while on supervised release (like Perez) but was previously sentenced to 15 years in prison for a federal narcotics conviction. *See* ECF No. 143 Govt.  Sent. Memo to Hardie at pg. 15, 19.

Miguel unlike his co-defendants has no prior federal convictions and did not commit the instant offense while on supervision and yet he finds himself in a more severe criminal history category due, in part, to his DWAI traffic infraction conviction.   More justly, Miguel's *true* criminal history should be in Category II appropriately reflecting his 2016 state felony conviction.

We respectfully request a downward variance be applied pursuant to 18 U.S.C. § 3553(a) because Miguel's criminal history is overstated.  See e.g., *United States v. Ramirez,* 421 F.3d 159, 166 (2d Cir. 2005) ("The Current section 4A1.3(b)(1) provides for the possibility 'that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes,' and authorizes the sentencing court to consider a downward departure to rectify any injustice created by faithful application of the Guidelines.") (internal citations omitted); *United States v. Hilts*, 696 F. App'x 1, 3 n.2 (2d Cir. 2017) ("Under U.S.S.G. § 4A1.3(b), a downward departure 'may' be warranted if 'the defendant's criminal history category substantially over-represents the seriousness of [his] criminal history or the likelihood that [he] will commit other crimes.'") (citing *United States v. Ingram*, 721 F.3d 35, 38-39 (2d Cir. 2013); *United States v. Montanez*, 717 F.3d 287, 289 (2d Cir. 2013) (same).[6]

### c.     Miguel is Deserving of a Lesser Sentence *Vis-à-vis* his Co-Defendants

Furthermore, sentencing Miguel well below the guideline range will not create any unwarranted sentencing disparities when compared to similarly situated defendants in this case. *See* § 3553(a)(6).

Consider the comparative sentences imposed on Miguel's two co-defendants thus far by the Court; sentences well below that advocated the government:

1. Dajahn Perez' guideline range was 151 to 188 months and the government advocated for a sentence of 151 months.  ECF No. 74, Govt. Sent. Memo to Perez at pg. 2.   The Court sentenced Perez to a well below guideline sentence of 96 months. ECF. No. 111

2. Peter Hardie's guideline range was 188 to 235 months and the government argued for a sentence of 188 months. ECF No. 143, Govt.  Sent. Memo to Hardie at pg. 1.  The Court sentenced Hardie to 156 months, again a sentence well below the guideline range. ECF No. 146.

---

[6] The case law references U.S.S.G §4A1.3(b)(1) for a downward variance. The Federal Sentencing Commission recently overhauled the U.S.S.G. in an attempted to streamline the guidelines and replaced the guideline departures with §3553(a) variances and deleted the entirety of §4A1.3 (Departures Based on Inadequacy of Criminal History Category) on November 1, 2025.  The argument and logic of the cited cases still applies with equal force.

9

Hardie's sentence is arguably most instructive as the government alleges he along with Miguel were "leaders of the DTO." Govt. Sent. Memo to Hardie at pg. 1. Although, their comparative supervisory role in the instant conspiracy is perhaps similar, they part company in other significant ways.

First, Hardie in fact controlled the New Jersey "stash house" where the firearm was found and the fentanyl was recovered. Id. at pg. 18. That stash house was a place Hardie spent significant time at and was in close proximity to Hardie's actual home in New Jersey. Id. Miguel on the other hand, was an infrequent visitor to the stash house which was a significant distance from his home in Central Islip, NY far out in Suffolk County. PSR ¶98. Indeed there is no evidence at all that Miguel had any control or dominion over Hardies's stash house – rather Hardie alone had exclusive authority over the stash house and the contents therein. There simply is no evidence that Miguel was aware of the fentanyl or the firearm contained in Hardie's stash house.

Second, Hardie's criminal history is significantly greater than Miguel's - Hardie was a profligate and prolific drug dealer over several decades. Govt. Sent. Memo to Hardie at pg. 18-19. Dating back to the 2000s, Hardie was arranging the large scale shipments – "tractor-trailer size" – of cocaine, heroin and methamphetamine across the United States. Id. Hardie ultimately pled guilty and received a very significant sentence of 15 years in jail. Id. Apparently, Hardie even recruited co-defendant Perez into the DTO after they met in federal prison. Id.

By all appearances Hardie is factually more culpably than Miguel and clearly has a far more troubling criminal history; yet the guidelines perversely place Miguel in a more draconian sentencing framework – demonstrative of the guideline's inability to properly calibrate a just sentence. Put simply, Hardie and Miguel are not similarly situated defendants and Miguel is deserving of a vastly different sentencing analysis.

Accordingly, an appropriate sentence for Miguel would be a sentence well below his guideline range of in harmony with the sentences meted out thus far.

Miguel understands that his offense conduct is serious and worthy of an appropriate jail sentence. He is facing a mandatory minimum of 5 years in jail and Miguel is well aware that any jail sentence means that a significant portion of his middle-age will be spent in a BOP jail. However, the 15 year (180 months) jail sentence recommended by Probation is in a word, cruel. Such a lengthy sentence would mean Miguel will remain in jail into his 60s and he would not see his youngest children again until they are well into their adulthood. The draconian sentence contemplated by the guidelines and recommended by Probation frustrates the goals articulated in § 3553(a).[7]

---

[7] Indeed, the U.S.S.G. drafters have recognized the abundant research on the rates of recidivism and its direct correlation to age - when the rates of re-arrest start to dramatically decline as one ages past 40 years old. *See*, Ryan Cotter, Courtney Semisch & David Rutter, *U.S. Sent'g Comm'n, Recidivism of Federal Offenders Released in 2010* (2021); *see also* Kim Steven Hunt & Billy Easley II, *U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders* (2017). *See*, https://www.ussc.gov/guidelines/amendments/proposed-2024-amendments-federal-sentencing-guidelines (At Pg. 15 of 621).

### *(4) Provide Medical Care and Substance Abuse Treatment*

Miguel's medical health and habitual drug abuse are another basis for a below guidelines sentence. Miguel suffers from high blood pressure and high cholesterol and takes medication to control both illnesses. PSR ¶102. As discussed in his PSR report Miguel has abused marijuana and opiate pain-killers for many years. PSR §106-108  He would greatly benefit from mental health treatment and substance abuse counseling during his incarceration.

Miguel acknowledges that his substance abuse has contributed to his poor decision making and he readily accepts that marijuana and opiates were awful ways to "treat" his depression and anxiety. To that end we respectfully request the Court consider his need and desire to receive treatment for his drug abuse and the underlying psychosis. Probation is in accord with this recommending Miguel receive drug treatment. PSR at pg. 34. Sentencing courts are mandated to consider the need to provide medical care for defendants and his hypertension and substance abuse certainly qualifies. *See* 18 U.S.C. § 3553(a)(2)(D).

### IV.    Conclusion

As a final thought, the attached character letters demonstrate that Miguel is a beloved man who unfortunately engaged in the instant offense conduct, but he endures and is fortunate to have a loving family who have embraced him with open arms and will always support him.  Miguel is not beyond redemption, rather he is a man filled with an abundance of compelling qualities that speak to his hope, kindness and his essential goodness.

Illustrative of that, is the kind words of Miguel's cousin, Balderys Luna:

> Miguel has shown regret for his actions and is committed to making better
> choices. He has a lot to live for, and I truly believe he deserves the opportunity to
> rebuild his life and be the father his children need. He is loved and respected by
> our entire family, and we are all standing by him, ready to support him as he takes
> the necessary steps toward redemption.
> Ex. A4.

We respectfully request the Court sentence Miguel to the statutory mandatory minimum sentence of 60 months of imprisonment; needless to say we are cognizant that this request is a significant variance from the guideline range. However, it accurately reflects the unique circumstances of this case and the individual that is Miguel.  In sum, the significantly below guideline sentence as requested by the defense would properly account for Miguel's role in the offense conduct, his prompt acceptance of responsibility, his medical condition, his abundant family support and his compelling personal history.

Sincerely,<br>
/s/<br>
Christopher Wright

Cc: AUSA Matthew King